COMMONWEALTH *vs.* HANCOCK FREE BRIDGE CORPORATION.

A statute, which authorizes the proprietors of a toll bridge built many years previous'y under the power conferred by their charter, to build and maintain a turnpike, at their own expense, leading towards their bridge, and separated therefrom only by a public highway of less than a mile long, and to take tolls on such turnpike, does not create a new and distinct franchise, but only enlarges the franchise conferred by their charter.

The Hancock Free Bridge Corporation, having, in execution of the authority, conferred upon them by their charter, to purchase from the Proprietors of the West Boston Bridge

" their bridge and the franchise thereof," accepted from said proprietors, and acted under, a deed purporting to convey their bridge and franchise, are bound to maintain and repair the turnpike built by said proprietors from Watertown towards their bridge under the authority conferred upon them by *St.* 1824, *c.* 15; although the Hancock Free Bridge Corporation, at the time of accepting the deed, protested against a clause therein, expressing that it was the understanding of the parties that in said franchise were included all the right, title and interest of the Proprietors of the West Boston Bridge in said road. Under the Rev. Sts. *c.* 39, § 42, which provide that " whenever any person liable to the payment of toll shall sustain any injury, by reason of any turnpike being insufficient or out of repair, the corporation owning said road shall be answerable for such injury, and also liable to indictment for such insufficiency and want of repair of their road," a corporation owning a turnpike road, and neglecting to keep it in repair, are liable to indictment, although no person liable to the payment of tolls has sustained injury by reason of such want of repair.

SHAW, C. J. An indictment having been found and returned into the court of common pleas of this county, and the trial in that court having resulted in a verdict of conviction, the case has been reported to this court by the judge who tried it, on the ground that the decision involved important questions of law.

The indictment alleges, that on the 1st of July 1852, and from that time hitherto, there existed a public highway in Cambridge, Brighton and Watertown, to the use of which all the inhabitants of the Commonwealth were entitled; that the same was out of repair, ruinous, dangerous to life and property, and a common nuisance; and that the defendant corporation were legally bound to maintain and repair the same, which duty they had neglected to perform. The defendants denied their legal liability to keep said section of highway in repair, or to maintain the same; and this was the issue tried. The case presents a question of some novelty, on account of the peculiar character of the highway in question, and of the peculiar relation in which the defendants, by the operation of various statutes, stand to that road.

The Hancock Free Bridge Corporation, the legal and corporate designation of the defendants, were established by *St.* 1846, *c.* 146. They were incorporated with usual powers, and authorized to build a new bridge across Charles River, between West Boston Bridge and Canal Bridge, and to take tolls thereon until the amount received should reimburse the proprietors all

cost of building said bridge and incidental expenses and six per cent. interest, and leave a clear and unincumbered fund of $100,000. When this should be accomplished, it was to become a free bridge. But there was a provision in § 7, that the new corporation might purchase and hold the West Boston Bridge and the franchise thereof, either at a price to be mutually agreed on, or settled by appraisers mutually chosen. A similar provision was made in regard to the purchase of the Canal Bridge. It was then provided, that in case the Hancock Free Bridge Corporation should purchase the other bridges, conformably to these provisions, or if this corporation should refuse to purchase them at such appraisement, then the authority given to them to build a new bridge should be void.

From this view of the statute, it seems manifest that it was not founded on any conviction on the part of the legislature that a new bridge, in a westerly direction from Boston, was necessary to the accommodation of public travel; but rather on a view of inducing the proprietors of the other bridges to conform to an arrangement, by which a free communication from the city to Cambridge and other places in a westerly direction might be obtained. It further appears to be the effect, if not the intent, of this statute, to hold out a strong inducement to the other proprietors to part with their chartered rights and privileges, by holding up to them the fear of losing a considerable part of their revenues, by the establishment of a rival bridge. In either aspect, it appears to have been the intent of the statute, in case of the purchase of the chartered rights of the West Boston Bridge — those of the Canal Bridge are immaterial to the present case — by the Hancock Free Bridge Corporation, that the latter corporation should entirely supersede the other; and that, after such alienation of its franchise, including in that general term all its rights and powers, the West Boston Bridge Corporation would cease to exist.

It appears that, after the passage of this act, a negotiation was entered into between the two corporations; that appraisers were mutually appointed, who, after a hearing, appraised the West Boston Bridge and its franchise at $75,000, at which

rate the one agreed to sell, and the other to purchase. The deeds, according to the terms of the act, were to be made and delivered, and the transfer closed, on or before the 1st of July 1846. Up to a short time previous to such transfer, no controversy appears to have arisen between the parties, touching the subject matter of the transfer ; that is, as to what was the nature and extent of the property, rights and beneficial interests, which the Hancock Free Bridge Corporation were to acquire, and under what duties and obligations they were to be placed, by such transfer and substitution.

The phraseology in the statute was, the Hancock Free Bridge Corporation should have the right to purchase and hold the " West Boston Bridge and the franchise thereof." This phraseology is frequently repeated in the statute, " their bridge and the franchise thereof." The same terms are used, in relation to the sale and purchase of the Canal Bridge and the franchise thereof.

When the Proprietors of West Boston Bridge came to prepare their deed of transfer, which they had voted to execute, and appointed a committee to act in their behalf, which deed bears date of the 1st of July, 1846, after reciting the act of the legislature, and the proceedings under it, they do, for the consideration of $75,000, " give, grant, bargain, sell, aliene, transfer and convey unto the Hancock Free Bridge Corporation, their successors and assigns, the bridge and franchise of them the said Proprietors of the West Boston Bridge." Nothing is here said of appurtenances or incidents, and nothing of duties or burdens. But they add this clause : " It being well understood, that in said franchise are included all the right, title and interest, which the Proprietors of the West Boston Bridge have, in and to the causeway from the westerly abutment of said bridge, and in and to the road from Cambridge to Watertown, as authorized by the act of the legislature to said proprietors, approved June 12th 1824."

When this deed was tendered to the Hancock Free Bridge Corporation, on the 1st of July 1846, the agents of the grantors were met by a vote passed on the same day, by the directors of

the Hancock Free Bridge Corporation, to this effect, (after reciting the deed tendered by the agent of the Proprietors of West Boston Bridge,) "it was voted, that the Hancock Free Bridge Corporation objects to and protests against the clause in the deed, which expresses the understanding as follows, viz : It being well understood, that in said franchise are included al the right, title and interest, which the Proprietors of the West Boston Bridge have, in and to the road from Cambridge to Watertown, as authorized by the act of the legislature to the proprietors, approved June 12th 1824." The case then finds that this vote was read to the agent of the Proprietors of West Boston Bridge, and the president of the Hancock Free Bridge Corporation stated to him, that this corporation received the deed under the protest contained in that vote. This deed was afterwards put upon record, the Hancock Free Bridge Corporation entered and took possession of West Boston Bridge, and have ever since received the tolls.

Here then we perceive the origin of the controversy, which has led to this indictment. The claim of the Commonwealth is, that by force of this statute, and the transfer of the rights and franchise of the Proprietors of West Boston Bridge to the Hancock Free Bridge Corporation, the latter became proprietors of the section of turnpike from Cambridgeport to Watertown, with all the rights, and subject to the same duties, under which it was held by those proprietors. To decide this question, we must look to the origin of this short turnpike, in order to ascertain whether it was part and parcel of the West Boston Bridge franchise, or a separate and distinct concern.

The short turnpike in question was made under the authority of an act of the legislature, passed on the 12th of June 1824, authorizing the Proprietors of West Boston Bridge to establish a turnpike from Cambridge to Watertown. *St.* 1824, *c.* 15.

In order to ascertain the true construction of this act, we must not only consider its terms, but the time and circumstances, and the probable purpose for which this authority was granted. Formerly, the West Boston Bridge took nearly all the travel coming from a westerly direction to Boston, between

Roxbury and Cambridge. But a few years previously to this act, by *St.* 1814, *c.* 39, the Boston and Roxbury Mill Corporation were incorporated, with power to make a dam from the westerly side of Boston to Brookline, and with authority to take toll upon it ; which was made and opened. But there is another act of the legislature, passed at a session immediately preceding the one we are considering, which it is proper to take into consideration, as existing at the time the act in question was passed. *St.* 1823, *c.* 81. This act authorized William Gray and others to make a turnpike road from the termination of the road made by the Boston and Roxbury Mill Corporation, by a direct line, to the square in Watertown. It provided that neither of the towns of Watertown or Brighton should ever be compelled to support any part of said road or bridge, without its own consent. The corporation were authorized to erect a gate and take toll ; but we believe no gate was erected or toll taken upon it.

In looking at this act, with reference to the well known localities of this part of the country, it is quite apparent that the effect and result of establishing this road, if it was not the direct object and purpose of it, was to invite the great amount of travel from the west, which is naturally concentrated at Watertown, to come into Boston over the Milldam, and to the like extent to divert it from its previous channel through Cambridge over West Boston Bridge.

It was in this state of the legislation, that, at the ensuing session in June 1824, the Proprietors of West Boston Bridge were authorized, probably on their own petition, to make their road from the same point in Watertown to the road in Cambridgeport, leading directly to their bridge ; which road is a public highway, less than a mile long, connecting with the causeway built by said proprietors at the westerly end of the bridge. The act authorizes the building of a road from Watertown to Cambridgeport, crossing Charles River twice by drawbridges ; it provides that neither of the towns of Watertown, Brighton or Cambridge shall ever be compelled to support any part of said road or bridges, without its consent ; it authorizes

said proprietors to erect a gate on said road, and to take toll; but this power was never executed.

From the terms and provisions of this act and grant of power, it appears to us, that it was not intended mainly to establish a new turnpike, as a substantive source of profit; but it was to increase the tolls at their main bridge, and thereby increase their revenue and enhance the value of their existing franchise. The provision that this line of road, along the margin of the towns through which it passed, should in no event be made a charge on those towns, without their consent, shows that it was not regarded as a way of common convenience and necessity; and the liberty to take toll, which was never used, shows that revenue from the road itself was not the main object. This road, to use a familiar phrase, was intended as a feeder to the toll bridge already existing.

The court are therefore of opinion, that this grant of power was additional and auxiliary to the powers already granted to the corporation, that it created no new and distinct franchise, but enlarged the franchise already held. It created no new capital; it was to be built and maintained out of the stock and profits of the Bridge Company, or by assessments on its members. It was to continue whilst their charter continued, and terminate with it. It seems to us like the ordinary case of a corporation, authorized by additional and subsequent acts, to exercise powers not originally embraced in the act of incorporation; as, for instance, a railroad corporation authorized to extend their road, make a branch, or widen their road, or alter its direction; the charter or franchise of such corporation consists of the mass of corporate powers and privileges legally conferred on it, either by original or subsequent acts. *Canal Bridge* v. *Gordon*, 1 Pick. 297. *Willink* v. *Morris Canal*, 3 Green Ch. 377.

What then was it intended, by *St.* 1846, that the defendants should purchase, and that the Proprietors of West Boston Bridge, as a chartered corporation, should sell, upon the terms proposed? Construing the concise terms used, with the obvious purpose and intent, we are of opinion that the subject of this transfer was the entire amount of property, rights, privileges and powers

held by them, as such corporation, subject to the duties and burdens necessarily incident thereto. But it is argued, on the part of the defendant corporation, that by the words, "their bridge and the franchise thereof," they mean bridge as a structure, and the right or capacity to own it, and take toll upon it. But we think this by far too narrow, and not the true construction. "The franchise of a bridge as a structure" would be unintelligible. Notwithstanding, in critical nicety, the last antecedent of "thereof" is "bridge," and so it must be grammatically construed; yet such critical nicety cannot control the obvious intent of the legislature, in tne whole act, to use the terms "West Boston Bridge and the franchise thereof,"·as *nomen generalissimum*, and thereby to include the entire chartered powers of the corporation.

The argument for the defendants seems to be refuted by the original act itself. *St.* 1791, *c.* 62. The grant of power, in the first sentence, is to build a bridge from the westerly part of Boston to Pelham's Island in Cambridge. The legislature well understood what was intended by a bridge structure, for they direct that it be well covered with plank or timber, with sufficient rails for the security of passengers. But they further direct that said corporation shall lay out and make a good road from Pelham's Island aforesaid to the nearest part of the Cambridge road. This, it is understood, was a road or causeway, over marsh and flats, nearly as long as the bridge itself, to be made at considerable expense, and without which the bridge itself would have been utterly useless. Was not the right of making this road, and the duty of making it, though no part of the bridge structure, within the franchise of the corporation?

Again; by an additional act, passed March 28th 1793, *St.* 1792, *c.* 87, the proprietors were made capable in law to purchase, hold and enjoy such lands, tenements and hereditaments, and the rents, profits and benefits thereof, as they should judge expedient for the better effectuating and securing the purposes of their incorporation, to their use, and to the use of their successors and assigns forever. And by § 3 they might take land, within certain limits, with a provision for a compensation to

6 *

the owners, with a very remarkable provision, which we may observe in passing, to note the change of times, that the bodies of any of said proprietors might be taken in execution to satisfy a judgment. Can it be doubted that the powers thus granted and the duties imposed by a separate act, a year after the principal act, became a constituent and inseparable part of the franchise of this corporation, and that the powers thus added, the property, rights and benefits derived under it, would pass to their grantees and successors, by the lawful transfer of their franchise? It appears to us that the additional act of 1824 was of the like kind, enlarging the charter and franchise of the corporation, in the manner so well expressed in the act of March 1793, " for the better effectuating and securing the purposes of their incorporation."

Another consideration is, that, from and after the transfer, the Hancock Free Bridge Corporation were to take all the tolls for travel over West Boston Bridge. Was it expected that the Proprietors of West Boston Bridge were to maintain the Watertown road without any income; or that the toll-gate was to be set up and the toll demanded; or the road itself be discontinued; in either event turning the travel into the rival avenue over the Milldam, and to a like extent diverting it from West Boston Bridge, and postponing the time for its becoming free? Neither of these constructions can be adopted, unless required by the express terms of the act; and we think they are not.

The argument, that the Hancock Free Bridge Corporation have no authority to take and hold the said road, and as a corporation to appropriate money for the maintenance and repair of the same, depends on the question already discussed; if the grant of the power to make the Watertown road was part of the franchise of the Proprietors of West Boston Bridge, then, by the terms of the act of 1846, they had power to purchase and hold it, and the duty of appropriating money to repair it follows of course.

The fact, that this road was not taken into consideration by the appraisers, either as a burden or a benefit, appears to us to have no weight in the argument; it was probably not brought to their notice.

We have laid no great stress upon the form of the deed tendered by the Proprietors of the West Boston Bridge; it shows however that it was their intention to include in their grant the Watertown road; and if they were authorized so to include it, and the Hancock Free Bridge Corporation were authorized to accept it, as we think they were, then their protest could be of no avail. They would be within the common rule, that a party who accepts a deed poll, and claims the benefits of it, cannot, by word or act, exonerate himself from the duty which such acceptance imposes. The language of the act is louder than that of the words. *Reed* v. *Boardman*, 20 Pick. 441. *Goodwin* v. *Gilbert*, 9 Mass. 510. *Lyme Regis* v. *Henley*, 3 B. & Ad. 77.

It is then contended, that if the defendant corporation are bound to repair the road in question, they are not liable to an indictment for a failure of that duty. It is certainly a general rule of law, that whenever any person or body corporate is bound to perform a public duty, an indictment will lie for its non-performance; and this is true in all cases, except when a new misdemeanor is created by statute, and a very special remedy is given for its punishment. In the present case, it is urged, as the construction of the revised statutes, that if the defendants are liable at all, it is under the turnpike law, as successors to a turnpike corporation; and that, by the turnpike law, the corporation is not liable to indictment, unless some person, liable to pay toll, has sustained injury by reason of the road being out of repair. It would indeed be very remarkable, if a law should be so framed, that a public duty could not be enforced, unless some person had actually sustained a private injury, and become entitled to a private action for redress, by reason of a neglect to perform it; in other words, that a public road, which a corporation is bound by law to repair, may become ruinous, obviously dangerous and nearly impassable, and yet the public have no remedy to compel its repair, unless some private person, liable to pay toll, shall venture upon it, and sustain injury. They are distinct remedies for distinct injuries.

We think the objection arises from a misconstruction of Rev. Sts. *c.* 39, § 42. There may be a slight obscurity in this section, arising from a practice, followed in many other passages of the revised statutes, where, in revising and consolidating preceding statute provisions, the fewest words possible are adopted. This section gives a remedy to an individual liable to pay toll, by declaring that "the corporation owning said road shall be answerable for such injury, and also liable to indictment for such insufficiency and want of repair of their road." Had two or three words been added, the construction, we think, would have been clear, but the sense the same; as, for instance, by placing a period or semicolon after "injury," and then proceeding, "and the corporation shall be liable to indictment for insufficiency and want of repair of their road." The word "such" does not limit the case to the insufficiency and want of repair which has actually occasioned injury to an individual, but to insufficiency and want of repair which renders it dangerous. In turning to the general turnpike act, which was in force when this short turnpike was established, *St.* 1804, *c.* 125, from which this was revised, towards the close of § 6, we find it stand as follows: "And the said corporation shall be liable to pay all damages, which may happen to any person from whom toll is demandable, for any damage which shall arise from defect of bridges or want of repair of said turnpike road; and also liable to presentment by a grand jury, for not keeping the same in good repair." This puts it beyond doubt what was the provision before the statutes were revised; and the commissioners intimate no intention to alter it. The case of *Williams* v. *Hingham & Quincy Bridge & Turnpike,* 4 Pick. 341, cited in the argument, was a private action against the corporation for injury sustained, given by the statute, and has no bearing on the present case.

The provision in § 40, for setting open the gates, by authority of the county commissioners, is merely cumulative, being included in the same act, which authorizes an indictment.

*Judgment on the verdict*

*A. H. Nelson & G. Bemis,* for the Commonwealth.
*J. C. Dodge,* for the defendants.