BROWN, J., concurring, arguendo; CLARK, C. J., dissenting, arguendo.
This is an indictment against the defendant for the violation of the provisions of chapter 216, Laws 1907, ratified 2 March, 1907, commonly known as the "Passenger Rate Law." The act does away with the requirement that all railroad companies shall furnish first- and second-class passenger accommodations, and establishes a uniform (498) rate of 2 1/4 cents per mile for passenger travel.
The material portions of the act necessary to an understanding of the questions decided by the court are as follows:
"SECTION 1. That no railroad company doing business as a common carrier of passengers in the State of North Carolina, except as hereinafter provided, shall charge, demand, or receive for transporting any passenger and his or her baggage, not exceeding in weight 200 pounds, from any station on its railroad in North Carolina to any other station on its said road in North Carolina, a rate in excess of 2 1/4 cents per mile; and for transporting children 12 years of age or under, one-half of the rate above described.
"SEC. 2. The rate for carrying passengers on leased lines shall be the same as is prescribed for the lessor or company Operating the same, and the Corporation Commission shall publish the rates fixed by this act for the several railroad companies operating in this State on or before the first day of June, 1907.
"SEC. 3 (refers to mileage books). *Page 362 
"SEC. 4. That any railroad company violating any provision of this act shall be liable to a penalty of $500 for each violation, payable to the person aggrieved by such violation, and recoverable in an action to be instituted in the name of said person in any court of this State having competent jurisdiction thereof; and any agent, servant, or employee of any railroad company violating this act shall be guilty of a misdemeanor, and upon conviction shall be fined or imprisoned, or both, in the discretion of the court.
"SEC. 5 (relates to free transportation).
"SEC. 6. That section 2618 of the Revisal of 1905 is hereby repealed, and all laws and clauses of laws in conflict with this act are hereby repealed.
(499) "SEC. 7. That this act shall be in force from and after its ratification."
On 8 May, 1907, the defendant, Southern Railway Company, filed a bill in equity in the Circuit Court of the United States for the Eastern District of North Carolina, on behalf of itself as complainant against Franklin McNeill, Samuel L. Rogers, Eugene C. Beddingfield, North Carolina Corporation Commissioners, and Robert D. Gilmer, Attorney-General, and Hayden Clement, Assistant Attorney-General, defendants, for an injunction against the enforcement of said act, and on that day his Honor, J. C.Pritchard, United States Circuit Judge, issued a temporary restraining order and required the said defendants to appear before him at Asheville on Wednesday, 26 June, 1907, to show cause why an injunction pendente lite
should not be issued. On 29 June, after a hearing in which the jurisdiction of the Circuit Court was challenged by the defendants, an interlocutory injunction was granted upon the bill of complaint and the answer thereto treated as affidavits, and upon affidavits filed therein by the complainants, and the cause was referred to the Hon. W. A. Montgomery, standing master of the Circuit Court for the Eastern District of North Carolina, to take and report to the court such evidence on any of the issues therein as either party might offer, and to make all needed computations, and to report fully to the court all the facts therein, and the cause was set down for hearing before the Circuit Court in Asheville on the first Monday in October, 1907.
In the meantime, at July Term, 1907, of Wake Superior Court, the defendant having refused and failed to obey the said statute, and having sold tickets to passengers throughout the State at a greater rate than 2 1/4 cents per mile, the grand jury indicted the defendant and its agent at Raleigh, T. E. Green, for the violation of said act. At the trial of the indictment at said term the defendant, Southern Railway Company, entered a plea to the jurisdiction of the Superior Court of Wake *Page 363 
County and put in evidence the proceedings of the Circuit Court (500) of the United States in which the injunction was granted.
The bill of complaint in the equity suit alleges certain facts from which the complainant draws the conclusion that the act of 1907 is confiscatory and in other respects violates its constitutional rights. It is averred in the bill that the Corporation Commissioners are given by the laws of this State such general control and supervision as is necessary to carry into effect the statutory regulations in regard to railroad companies and corporations engaged in the carrying of freight or passengers, and have the power to obtain such information as may be necessary to enforce the provisions of the said law, and that it is provided by the law of this State that any railroad company doing business in the State, or any railroad company organized under the laws of any State and doing business in this State, is made liable to heavy penalties if it fails to comply with the provisions of the law concerning the charges for freight and passengers, and in such ease it is made the duty of the Corporation Commission to notify the Attorney-General, who shall take such proceedings in regard thereto as he may deem expedient. That the Assistant Attorney-General is invested with the same powers and is required to perform the same duties as the Attorney-General, including the duties and powers just mentioned. It is further averred that the Corporation Commission is required by the act of 1907 to publish the rates fixed by that act for the several railway companies operating in this State, on or before 1 June, 1907, and, for the reasons just stated, the members of the Commission and the Attorney-General and his assistant are made defendants to the suit. The complaint also alleges certain matters tending to show its net earnings from intrastate traffic for 1906 to be $324,754.64 under the rate existing prior to the operation of the act of 1907, when the passenger rate was 3 1/4 cents per mile, and then concludes (without any satisfactory statement of the facts or reasons as to how the result is reached) that, under the new rate, the maximum of net earnings for the same year would have (501) been $28,077.47, showing a reduction, by reason of the reduced rate, of $296,747.17. It then tabulates the figures so as to show how the maximum of net earnings for 1906 was ascertained, from which table it appears that the maximum earnings from intrastate traffic in this State, after paying the cost of operation for said year, amounted to $453,811.41, and that the ratio of the intrastate gross traffic in this State for said year to the entire gross traffic, both interstate and intrastate, was 27.60 per cent, and by deducting from the total amount of the maximum earnings for intrastate traffic ($453,811.41) the proportion of the taxes chargeable to it and based upon said ratio ($74,423.73) and its proportion of the cost of improvements and betterments not capitalized ($54,633.64), *Page 364 
the maximum net intrastate earnings would be $324,754.64. The complainant then attempts to show that the new rate would, as it says, inevitably affect its intrastate business by reason of the fact that many of its intrastate rates and all or nearly all of its interstate rates for passengers are made, and necessarily made, on a combination of "locals," or by the use of "locals" as factors in the computation, and when the local rate in this State is reduced, the effect would be to reduce the rate upon its interstate traffic, and consequently the loss of the complainant in the equity suit, the defendant in this criminal action, would be much more appreciable and much greater than is represented by the figures already given. The complainant in the bill then recites several acts of the General Assembly which it alleges would also diminish its income — for example, the assessment of railroad property in stock-law territory for local benefits, the act prescribing the hours of service for employees of railway companies engaged in the operation of trains, the law authorizing the Corporation Commission to require railroads to erect and maintain depots, and an act to enlarge the powers of (502) the Corporation Commission, which, upon examination, seems to confer upon that body ample authority to keep the railway corporations of the State within the law and under proper control. These acts are virtually alleged to be hostile to the interests of the railway companies and to impose additional and heavy burdens upon them, too grievous to be borne with a reduced' passenger tariff. The complainant in the equity suit, and defendant in this indictment, further complains that there is a difference between the commercial value of property in this State and its value as assessed for taxation, and this applies to all classes of property subject to taxation, and that the value at which its property is assessed for taxation is not really the true value, which is much more, and that the real or commercial value (which we assume to be its market value) should be considered only in determining what is a fair and reasonable passenger and freight rate in its business as a common carrier and in performing the public service required of it by the law, but it alleges that the State should be estopped to deny that the property is not worth as much as its assessed value. The complainant then tabulates certain figures showing (as it avers) the ad valorem
assessment of its property which it thinks should be apportioned to its intrastate traffic as the basis of determining the reasonableness of the legislative rate for the carriage of passengers, towit, $7,213,222.74, and showing also other items, such as the amount of its bonded indebtedness, which is a lien upon its property in this State ($24,623,078.29), the interest thereon ($714,193.08), the annual trackage and rentals paid for lines used by it here ($481,189.99), the net income for intrastate business which should contribute its pro rata part to the payment of said *Page 365 
interest ($329,900.89), and the total net earnings under the new rate, based upon preexisting conditions, showing, according to its calculation and the basis upon which it proceeds, a deficiency of $301,893.42 for the fiscal year ended 30 June, 1906. It then alleges that there has been an increase in the operating expenses since June, (503) 1906, which will reduce the net result proportionately. It admits that the general commercial conditions in this State are of a prosperous kind, and that intrastate passenger traffic is large, but it avers that there will be no comparative or substantial increase in its business or tonnage resulting from the proposed reduced rates, passenger and freight. It further alleges that its operations have been economically conducted, and insists that, as the cost of performing the service to the public has been increased, the former rate of 3 1/4 cents per mile, instead of being reduced, should be raised still higher, so as to meet the increased cost of operation. The complainant in the bill then avers that the former rate, or the one existing prior to July, 1907, when the said act became effective, is a reasonable one, and fairly and properly adjusted in its proportion to the value of its property and its sources of income in this State, and to diminish it would result in taking its property without due process of law, and in depriving it of that equal protection of the law to which it is entitled under the Constitution. It complains of the provision in regard to mileage books, and especially the requirement that it must accept the mileage books of other railroad companies for transportation of passengers over its own lines, without any proper limitation as to the time for redemption of such books. There is a special allegation in the bill that if the defendants are not restrained by the process of the court the complainant will be exposed to a multiplicity of suits for penalties which it will be impossible to defend by proving the facts in each case, which would show the confiscatory and otherwise unconstitutional character of the said legislation, and that by reason thereof its credit will be injured and its business and property wrecked; whereas in the said suit in equity the said matters can be fully shown, once for all, and great expense and unnecessary litigation avoided. That the said suit was instituted for the purpose of determining, in an orderly and conclusive way and by a proceeding in which all the diverse interests can be represented, the essential questions in controversy (504) between the complainant and the State in respect to the validity of the said legislation and of obtaining injunctive relief to preserve thestatus quo until the final decision is made. In this connection it avers its willingness to protect the rights of the traveling public, if the suit shall finally be decided against the complainant, by giving a transferable coupon to each passenger, representing the difference between the old and the new rate, and to secure the payment of the same by proper and sufficient indemnity. *Page 366 
The defendants appeared and answered the bill of complaint, denying its material allegations, except as to the official character of the defendants, and they aver, and support their averment by the statement of pertinent facts, that the State, in enacting the legislation which is assailed by the complainant in the equity suit, was only exercising its sovereign power and authority, and that the legislative will as thus expressed should be respected and obeyed until its enactment is declared by a court of last resort to be invalid, and that the general charges and speculative theories of the complainant, based upon incorrect averments of facts and inaccurate estimates contained in the bill, should not be allowed to stay the immediate and effective operation of the act of 1907. That the complainant has, in the ways mentioned, been selling tickets at 2 cents and 2 1/4 cents per mile. They aver that the figures and estimates as given by the complainant in its table do not agree with those it reported under oath to the Corporation Commission, as it was required by the law to do, and that if the calculation is made upon the basis of the reports thus made to the said Commission, it will show conclusively, or "demonstrate," that the increase for the year ended 30 June, 1906, should have been considerably in excess of a just and reasonable compensation for the value of the service rendered by the complainant or the use of the property employed by it. They aver that the maximum earnings of complainant for the year ended June, 1906, (505) were nearly twice as much as is stated in its bill of complaint, and, instead of being $453,811.41, they were, in fact, $823,546.80, as shown by its sworn report of 9 November, 1906, and, deducting therefrom the amount of taxes chargeable to intrastate business ($74,423. 79) and the cost of betterments ($54,633.04), the maximum net earnings for the said year were $694,490.03, which would produce an income of 9 3/4 per cent on $7,213,322.74, the proportionate assessed value of the complainant's intrastate property and franchises; and if the reduction in the rate would diminish the net earnings to the extent of $296,747.17 (which is denied), there would still be left net earnings to the amount of $397,742.86 instead of $28,007.47, as stated in the bill, which amount would yield a net income of 5% per cent on the said value; and that even this percentage of income is far below the real per cent of the actual net income as shown by verified reports of the complainant to the Corporation Commission, which is more than 9 per cent. The true result is shown in this way: The gross earnings in the State, including freight, passenger, express, mail, and miscellaneous earnings, were $3,159,156.89, and the operating expenses charged against such intrastate traffic were $2,335,610.09. The amount of operating expenses is clearly erroneous, as shown by the items thus reported to the Commission. These are set out in the answer and reduce the above amount *Page 367 
($2,335,610.09) to $2,063,726.19, which is 65.48 per cent of the gross earnings in this State ($3,159,156.89), and the actual earnings, therefore, were $1,080,420 instead of $823,346, as alleged by the complainant in the bill. Deducting the amounts properly chargeable for taxes and betterments — that is, $74,423.73 and $54,633.04, respectively — the maximum actual net earnings were $951,363.23 instead of $324,764.64; and if, by the act of 1907, the reduction in the earnings would be $296,747.17, there would still be left $654,616.06, as against $28,607.47, the amount stated in the bill, which would have been more than 9 per cent of the assessed value of its property used in intrastate commerce; (506) and even if the said property were assessed at its commercial or true value instead of its value for taxation, the business of the complainant would yield a fair profit thereon. If the interstate as well as the intrastate business of the complainant in this State is taken into the calculation, the net earnings, after paying taxes and making all other proper deductions, would have been $3,967,218.13; and, assuming that the loss of income will be $296,747.17, as alleged by the complainant, there would still be left net earnings on the business in this State of $3,690,476.96, which would yield 14 per cent of the assessed valuation of its property. The defendants further aver that large sums have been paid for grossly extravagant salaries and for improper and unlawful purposes by the complainant, which should be excluded from the computation, and there should be excluded also sums paid out by the complainant on account of the negligent management of its property. That the sum of $672,543.14 was paid out on account of its interstate business which is not chargeable to its intrastate traffic and which should not be included in the calculation. The defendants then aver that the earnings of the complainant for the year 1906 were greatly increased over those of the previous year, and, counting back of that year and comparing each year with its successor, a very large increase is shown, while there was a steady decrease in the operating expenses. The figures are given as shown in complainant's report to the Corporation Commission. It is also alleged that the stock of the defendant is "watered," or, in other words, is larger in proportion than the real value of its property, and that its bonded indebtedness is also largely in excess of the actual value of its property. They deny that there has been any discrimination against the complainant in the legislation of the State relating to stock laws, hours of service of railroad employees, or in any other respect, and they aver that the legislation so complained of is merely for (507) the protection of life and property and reasonably required for the proper and humane operation of railroads. The defendants further allege that the complainant has grossly discriminated against the traffic and the shippers of this State in its scale of rates, and state circumstantially why this charge is made. *Page 368 
The defendants insist, upon the facts stated in the bill and upon the several legislative acts mentioned therein, that the Attorney-General and his assistant and the Corporation Commission are not charged with any duty the performance of which is essential to the complete operation of the act of 1907 from and after the time when it is therein declared to have effect, and that the act is therefore self-executing. They then deny the right of the United States Circuit Court to enjoin the said officers from discharging their duties in the enforcement of the criminal laws of the State.
Affidavits were filed in support of the bill to show what was a fair return for capital invested in industrial enterprises, the increase in the cost of the operation of railroads, and that there is no discrimination by the defendant as between individuals or localities in this State, and that if there is any increase in travel by reason of the reduced rates there must be a corresponding increase in expense to provide additional facilities to accommodate it. These affidavits, though, are of a most general and unsatisfactory nature and seem to be the expression of witnesses, experts though they declare themselves to be, as to what may happen in the future, under changed conditions produced by the enactment of the law of 1907. Upon the showing made by the complainant, the United States circuit judge issued an interlocutory injunction to the final hearing, by which the defendants were restrained from proceeding to perform the duties assigned to them under the laws of this State with reference to the enforcement of the act of 1907. The defendants filed a plea to the jurisdiction of the Superior Court, which was based upon (508) the proceedings in the Circuit Court of the United States, and which was heard as upon demurrer thereto by the State and overruled by the court. The defendant excepted, upon the ground that the United States Circuit Court had acquired jurisdiction of the suit therein pending and of all matters pertaining thereto, and that the proceeding in the State court is void and deprives it of due process of law and of the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States. The defendant then requested the court to pass upon its motion to quash the bill previously made in apt time. The motion was overruled.
The defendant moved for a continuance, which motion was also overruled, but this Court is of the opinion that the motion, as appears from the record, was dilatory and was properly overruled, even if the ruling of the court upon such a discretionary matter can be reviewed in this Court. There were various objections taken to the rulings of the court upon other questions raised during the course of the trial, but if any of them are tenable they are not material in the view we take of the ease. The court then required the defendants to plead to the indictment, *Page 369 
and gave them time to do so. They declined to do so, and the court directed the clerk to enter for each of the defendants the plea of "Not guilty."
The defendant requested the court to charge the jury as follows:
"1. The court instructs the jury that the statute on which the indictment in this case is founded does not make the railroad company guilty of a misdemeanor for selling a ticket or causing a ticket to be sold at more than 2 1/4 cents per mile, and that therefore the jury must disregard the second count in the indictment and cannot find the Southern Railway Company guilty.
"2. The act under which the bill of indictment is drawn does not make the defendant railroad company guilty of a violation of the criminal law by selling passenger tickets at a greater rate than (509) 2 1/4 cents per mile, and upon the second count the court charges the jury that they shall render a verdict of `Not guilty.'"
These instructions were refused by the court, and the defendant excepted.
So much of the charge of the court to the jury as is necessary to be set out was as follows:
"This is an indictment under an act of the Legislature of North Carolina, ratified on 2 March, 1907, chapter 216, which has been read in your hearing and which declares that no railroad company doing business as a common carrier of passengers in the State of North Carolina, except as in the act provided, shall charge, demand, or receive for transporting any passenger and his or her baggage not `exceeding 200 pounds in weight, from any station on its road in North Carolina to any other station on its road in North Carolina, a rate in excess of 2 1/4 cents per mile, and for transporting children under the age of 12 years one-half of the above rate prescribed.
"One of the counts in the bill is against the defendant T. E. Green, and the other count includes in the indictment the Southern Railway Company. The court instructs you that the common law obtains in North Carolina, except when it is changed or modified by statute.
"If a statute of the State prohibits a matter of public grievance, or commands a matter of public convenience, all acts or omissions contrary to the prohibition or command of a statute injurious to the public, being misdemeanors at common law, are punishable by indictment.
"A crime or misdemeanor may be defined to be an act committed or omitted in violation of a public law, either forbidding it or commanding it. In other words, a crime is any wrong which the Government deems injurious to the public at large and punishes through a judicial proceeding in its own name. *Page 370 
(510) "Therefore, under the laws of the State of North Carolina, a railroad company doing business as a common carrier of passengers and selling tickets from one point on its line of road in the State of North Carolina to another point in the State, and having and operating more than 60 miles of road, and not being exempted from the provisions of the act, as read in your hearing, which sells passengers such tickets for a greater rate than 2 1/4 cents per mile, is guilty of a violation of the law and of the commission of a misdemeanor.
"If you find, therefore, from the evidence, and beyond a reasonable doubt, that the defendant, the Southern Railway Company, is a corporation doing business as a common carrier of passengers in the State of North Carolina, and that on 8 July, 1907, or on any other date since 1 July, 1907, and before the finding of the bill of indictment in this case, sold, through its servants or agents at Raleigh, or any of them, to W. F. Jones, a ticket from Raleigh to Cary, from which the coupon introduced in evidence was detached, at a greater rate than 2 1/4 cents per mile for the distance between these stations, and charged, demanded, and received such amount in excess of 2 1/4 cents per mile in transporting the said Jones as a passenger, then, upon such finding made by you, the court charges you that the defendant, the Southern Railway Company, would be guilty of the misdemeanor charged in the bill, and your verdict as to the Southern Railway Company upon such finding would be `Guilty.'
The jury returned a verdict of guilty. The defendant, Southern Railway Company, moved for a new trial, and, the motion being overruled, it excepted. The said defendant then moved in arrest of judgment. This motion was also overruled, and the defendant excepted. The court, on motion of the solicitor and upon the verdict of the jury, adjudged that the defendant, Southern Railway Company, pay a fine of $30,000, it appearing that the defendant railway company (511) had been violating the act of Assembly since 1 July, 1907, throughout the State.
Before imposing the fine, the court stated that if the Southern Railway Company would agree to obey the law until a court of last resort could pass upon the questions involved, it would impose a light sentence upon it, as it had done upon the defendant T. E. Green. The railway company refused to comply with the law, but announced that it would stand upon its rights. The judgment, as aforesaid, was thereupon entered, and the defendant, having duly excepted to all the rulings and to the judgment, appealed to this Court.
After stating the case: This in one respect is a case of supreme importance. It involves the right of the State to enforce its criminal laws without interference by the National Government or its courts. If the defendant is right in its contention, the authority or separate sovereignty of the State is a myth, and not, as we had supposed, a reality. We had taken it to be settled, without leaving room for cavil or controversy, that a Federal court could not stay the arm of a sovereign State in the execution of its criminal laws. If any exception to this just and necessary rule exists, it must be a very rare one, and cannot for a moment be considered as applying to this case. But before analyzing the ingenious but specious argument advanced in favor of so astounding a doctrine as that upon which the defendant relies, and showing its utter fallacy, let us consider, first, the preliminary questions raised by the defendant. It is but fair to the able, learned, and just judge who presided at the trial that we should do so. The defendant complains that it was not given proper time to prepare its defense. In other words, that it was forced hurriedly into the trial, and, too, with such undue haste as to deprive it of the ability to concert its (512) defense. This is a grave charge to make, and, if substantiated by the record, it was a violation of the defendant's constitutional rights, we admit; but we are able to state that it is met conclusively and disproved by the facts as they appear in the case. We are convinced that every reasonable opportunity was afforded the defendant, not only for entering its pleas and submitting its motions, but for trying the case and defending itself upon the real legal merits. The presiding judge distinctly announced that the court would sit as long as it was necessary to develop all the facts of the case, even though the term of the court should be extended beyond the time allotted by the statute. This the judge had the power to do. Revisal, sec. 3266. Could the defendant expect to receive a more liberal allowance of time? The other positions taken are equally untenable, and we overrule all of the preliminary motions as dilatory and declare that the judge's rulings thereon did not affect any substantial right of the defendant. We will not refer to the other exceptions, as the view we take of the case renders it unnecessary to do so. The defendant received absolutely fair treatment from the court in very respect.
We now proceed to consider the case upon its legal merits. Two questions are raised:
1. Did the proceedings in the United States Circuit Court constitute a defense to the indictment or prevent the grand jury from returning the bill and the State court from taking cognizance of the same and trying the case?
2. Is any criminal offense charged in the bill of indictment? *Page 372 
These are the pivotal and decisive questions in the case. We would not discuss the first question stated, in view of our ruling upon the second, but for the fact that the arguments of counsel and their briefs are largely devoted to its consideration, and it is a question of the greatest magnitude and gravity. We think, though, that it has been conclusively settled against the defendant's contention by the (513) rulings of the court of last resort having the power and jurisdiction to finally pass upon it. It is so serious a question and so far-reaching in its consequences, if the defendant be right in respect to it, that it cannot perhaps be too often decided against its present contention, if this is to remain a government of the people, by the people, and for the people, as originally contemplated by its framers, and the rights of the States arc to be preserved unimpaired. If it is ever held, as it surely will not be, that the Federal courts can virtually take charge of our State governments by the process of injunction, the separate sovereignty of the States, as distinct from that of the Federal Government, will be completely extinguished. It has been said, at least once, by the Court of highest authority:
"We have already had occasion to remark at this term that `the people of each State compose a State, having its own government and endowed with all the functions essential to separate and independent existence,' and that `without the States in union there could be no such political body as the United States.' Not only, therefore, can there be no loss of separate and independent autonomy to the States through their union under the Constitution, but it may be not unreasonably said that the preservation of the States and the maintenance of their government are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National Government. The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." Texas v. White, 7 Wall., 725; Lane v. Oregon, ib., 71.
And this was so said since the Thirteenth and Fourteenth Amendments to the Constitution of the United States were ratified.
Can this possibly be so if the defendant's contention as to the effect of the equity proceedings in The Federal courts is the correct one? The trend of the argument it now makes was clearly seen at once by (514) the Supreme Court of the United States, and they paused to examine it and refused finally to accept it as based upon the correct theory of our government. If we adopt it as sound and carry it to its logical results, it would destroy the proper functions of the States.
We will first refer to the latest exposition of the Constitution, in this respect and quote from the most recent case upon the subject, decided in *Page 373 
1906, at the last term of the Supreme Court of the United States (Urquhartv. Brown, 205 U. 5., 179, opinion by Justice Harlan);
"It is the settled doctrine of this Court that, although the circuit courts of the United States and the several justices and judges thereof have authority under existing statutes to discharge upon habeas corpus
one held in custody by State authority in violation of the Constitution or of any treaty or law of the United States, the court, justice, or judge has a discretion as to the time and mode in which the power so conferred shall be exerted; and that, in view of the relations existing under our present government between the judicial tribunals of the Union and of the several States, a Federal court or a Federal judge will not ordinarily interfere by habeas corpus with the regular course of procedure under State authority, but will leave the applicant for the writ of habeascorpus to exhaust the remedies afforded by the State for determining whether he is illegally restrained of his liberty. After the highest court of the State competent under the State law to dispose of the matter has finally acted, the case can be brought to this Court for reexamination. The exceptional cases in which a Federal court or judge may sometimes appropriately interfere by habeas corpus in advance of final action by the authorities of the State are those of great urgency that require to be promptly disposed of — such, for instance, as cases `involving the authority and operations of the General Government, or the obligations of this country to or its relations with foreign nations.' The present case is not within any of the exceptions recognized in our former decisions. If the applicant felt that the decision upon habeascorpus in the Supreme Court of the State was in violation of his (515) rights under the Constitution or laws of the United States, he could have brought the case by writ of error directly from that court to this Court."
The same Court, in Reid v. Jones, 187 U.S. 153, said that one convicted for an alleged violation of the criminal statutes of a State, and who insists that he is held in violation of the Constitution of the United States, "must ordinarily first take his case to the highest court of the State, in which the judgment could be reviewed, and thence bring it, if unsuccessful there, to this Court by writ of error; that only in certain exceptional cases, of which the present is not ore, will a circuit court of the United States, or this Court upon appeal from a circuit court, intervene by writ of habeas corpus in advance of the final action by the highest court of the State." So, in Drury v. Lewis, 200 U.S. 1, it was held that in case of the custody by State authorities of one charged with crime, the settled and proper procedure is for a circuit court of the United States not to interfere by habeas corpus "unless in cases of peculiar urgency, and that instead of discharging they will leave the *Page 374 
prisoner to be dealt with by the courts of the State; that after a final determination of the case by the State court, the Federal courts will even then generally leave the petitioner to his remedy by writ of error from this Court. The reason for this course is apparent. It is an exceedingly delicate jurisdiction given to the Federal courts by which a person under an indictment in a State court and subject to its laws may, by the decision of a single judge of the Federal court upon a writ ofhabeas corpus; be taken out of the custody of the officers of the State and finally discharged therefrom." It is true, and we will give the defendant the full benefit of this concession, that in Urquhart v. Brown, supra, the Court was considering a question which arose upon a petition for the writ of habeas corpus, but it is not so much the particular (516) form of the controversy as the principle involved in it that controls as a precedent. The point intended to be decided was that full play should be given to the procedure of the State courts in the prosecution of its criminals, provided the latter have the right of appeal to the courts of last resort in the State, to the judgments of which a writ of error will lie from the Supreme Court of the United States to review the judgment of the State court when any question as to an invasion of the constitutional rights of the defendant may be presented. Instead, therefore, of pleading the proceedings in the Federal Court, the defendant should have set up its defense upon the merits in the State court and have brought any unfavorable or adverse rulings of the court below here for review, and if it had been deprived of any constitutional right or guaranty we would have corrected the error. If we should have decided against the defendant's contention — for example, that its property was about to be confiscated and its constitutional rights denied — it still would have had the remedy by writ of error to review the judgment of this Court — that is, if Urquhart v. Brown states the correct principle and will continue to stand as a precedent, and we think without doubt that it will.
But there is a more serious and conclusive answer to the defendant's contention. It is stated with great clearness and force in the briefs of counsel for the State, where the true doctrine is ably and learnedly presented. The question of separate State sovereignty may not directly and necessarily be involved, but it is incidentally. Can a judge of the Circuit Court of the United States stay proceedings by the State in the prosecution of its criminals? This is not too broad a statement of the proposition upon the affirmative of which the learned counsel for the defendant rest their case. Let us see what this Court, and the Supreme Court of the United States, whose decisions we must respect and obey, have said upon this subject. It should require no legal argument to demonstrate the fallacy of the defendant's position. The question is *Page 375 
merely what has been decided, for the identical matter has (517) frequently been considered and determined by this Court and by the Supreme Court of the United States. There can now be no doubt as to how this Court has ruled upon it, and that ruling is in perfect harmony, as we think, with the determination of the highest Court. If anything, the latter has been more pronounced in denying to the Federal courts the jurisdiction now asserted to reside in them.
The question was fully considered by this Court in Paul v. Washington, 134 N.C. at p. 380, and, without quoting liberally from the opinion, we will extract therefrom the general principle established. It is there substantially said that there are two objections to the plaintiff's right to maintain this action — first, the courts cannot enjoin the enforcement of the criminal law or of municipal ordinances imposing fines or penalties. In regard to the first objection, we must bear in mind that if the court should issue an injunction against the institution of a criminal prosecution, it would not only interfere with the due administration of the criminal law, which is of the first importance in any well-ordered system of government, but it would have to restrain action by the State, in whose sovereign name and capacity all criminal cases are commenced and prosecuted, and the State is not even a party to the action and her rights cannot be prejudiced without notice and a hearing, even if we could entertain for a moment with any seriousness the proposition that a court of equity can interfere by injunction with the administration of the criminal law. The violation of a town ordinance is made by our statute a misdemeanor. The Code, sec. 3820. If it is contended that the ordinance imposes a penalty for each violation of it, and that a court of equity will interfere on behalf of the plaintiff to prevent vexatious litigation and a multiplicity of suits, one answer, and a conclusive one, is that a court of equity will never assume jurisdiction in such a case until the rights of the complaining party or, in this particular case, the validity of the ordinance has been first (518) determined in an action at law.
In Wallace v. Society, 67 N.Y. 28, the general rule is stated to be that a court of equity will not restrain a prosecution at law when the question is the same at law and in equity. An exception exists where an injunction is necessary to protect a defendant from oppressive and vexatious litigation. But the court acts in such cases by granting an injunction only after the controverted right has been determined in favor of the defendant in a previous action. On this ground the chancellor inWest v. Mayor, 10 Paige, 539, dissolved a temporary injunction restraining the defendant from prosecuting suits against the complainant for violation of a municipal corporation ordinance claimed to be invalid. The unconstitutionality of the act of 1872, he said, would *Page 376 
be a perfect defense to a prosecution for the penalties given by it, and the question as to the validity of the act has not been determined. It would doubtless be convenient for the plaintiff to have the judgment of the court upon the constitutionality of the act before subjecting himself to liability for accumulated penalties. But this is not a ground for equitable interference, and to make it a ground of jurisdiction in such cases would, in the general result, encourage rather than restrain litigation. The question as to the validity of a corporation ordinance does not properly belong to the court for decision, where the complainants, as in the case presented, have a perfect defense at law, if the ordinances are invalid or if they do not render the complainants, or those in their employ, liable for the penalties. And it would be an usurpation of jurisdiction by the court if it should draw to itself the settlement of such questions when their decision was not necessary in the discharge of the legitimate duties of the court. The court would not grant an injunction to protect him against the multiplicity of suits until his right to such protection had been established by a successful defense at law in some of the suits. We find the rule stated in 16 A and E. (519) (2 Ed.), 370, as follows: "It is a well-settled rule, both in England and America, that a court of equity has no jurisdiction to interfere by injunction to restrain a criminal prosecution, whether the prosecution be for violation of statutes or for an infraction of municipal ordinances. The rule applies, whether the prosecution is by indictment or by summary process, and to the prosecutions which are merely threatened or anticipated, as well as those which have already been commenced. So it is not within the power of the parties to waive the question relating to the jurisdiction of the court to compel it to try the cause. If the prosecution is under an ordinance, no ground for enjoining it is constituted by the fact that the ordinance is void or that the party seeking the injunction has not committed a violation of the ordinance, or that the complainant in the prosecution under the ordinance states no cause of action."
"We have no case, however," says the Court, in Burwell v. Craig,30 Ala. 138, "where chancery has restrained a simple trespass or succession of trespasses on either the person or personal goods. The utmost extension of the principle which has come under our observation embraces only the trespasses to realty, where the remedial agency is shown to be necessary to prevent multiplicity of suits or to avert irreparable mischief. The judgment and sentences of the town council, of which the appellant complains, were quasi-criminal proceedings. A bill in chancery to restrain a malicious or unfounded prosecution is certainly of novel impression. We have not been able to find any principle or adjudged case which justifies an injunction to stay a prosecution, either *Page 377 
criminal or quasi-criminal, or to restrain a trespass to the person or personal property. We think such a precedent would be an alarming stretch of equity jurisdiction. In considering this case simply on the equity of the bill we have necessarily regarded its averments as true. It is not intended by this to intimate an opinion on the validity or invalidity of the ordinance, or of the fines imposed on the appellant; they will be considered when properly presented." (520)
And, later, in Moses v. Mayor, 52 Ala. 198, it was held by the same Court that courts of equity will not interfere to stay proceedings in criminal matters or in any case not strictly of a civil nature. They will not grant an injunction to stay proceedings on a mandamus, or an indictment, or all information, or a writ of prohibition. The courts of law have complete jurisdiction to punish the commission of crimes, and can interpose to prevent their commission by imprisoning the offender or binding him to keep the peace. But courts of equity have no jurisdiction over such matters; at least, a court of equity cannot entertain a bill on this ground alone. A bill in chancery to restrain a malicious or unfounded prosecution is certainly of the first impression, and there is neither principle nor authority to support it. Municipal authorities, it is said, would be paralyzed in discharging the public duties entrusted to them if every offender against the ordinances they have proclaimed could by injunction arrest them, or could by multiplying his offenses invoke the interference of a court of equity. The counsel for the appellant sought to withdraw the case presented in the bill from the operation of this general principle and the authorities by which it is supported, upon the ground that the interference of a court of equity is necessary in this case for the prevention of vexatious litigation and of a multiplicity of suits. It could well be said in answer that the litigation and multiplicity of suits apprehended are criminal in their character and without the jurisdiction of the court.
In Hottinger v. New Orleans, 42 La. Ann., 629, the Court refused to exercise its equity jurisdiction to restrain the enforcement of an ordinance penal in its nature, upon the ground that "the ordinance was enacted in pursuance of the police power vested in the city, whether rightfully or wrongfully is not to be determined in this suit. It was a police regulation in the interest of public health, with a penalty for its violation. The pecuniary loss in the enforcement of the ordinance cannot therefore be considered in determining the (521) question of jurisdiction. The enforcement of the ordinance is vested by the Constitution and law of the State in the recorder's court of the city of New Orleans. If the ordinance is unconstitutional, as alleged, the plaintiff can suffer no injury, as she has her remedy and can urge her defense in the recorder's court. Failing there, she has her remedy *Page 378 
by appeal to this Court." See, also, Devron v. First Municipality, 4 La. Ann;, 11; Beach on Injunction, sec. 520; Eldridge v. Hill, 2 Johns. Ch., 281; Field v. Western Springs, 181 Ill. 186; 1 Spelling Inj. and Extr. Rem., sec. 694; Burch v. Cavanagh, 12 Abb. Pr., 410; Wardens v. Washington,109 N.C. 21; Scott v. Smith, 121 N.C. 94; Vickers v. Durham, 132 N.C. 880;Busbee v. Lewis, 85 N.C. 332; Busbee v. Macy, 85 N.C. 329; Pearsonv. Boyden, 86 N.C. 586.
In Cohen v. Comrs., 77 N.C. 3, the Court held that if the defendants have an unlawful and void ordinance and have arrested and fined the plaintiff, he has a complete remedy at law by exception and appeal, and cannot resort to the jurisdiction of a court of equity for relief. "We are aware of no principle or precedent for the interposition of a court of equity in such cases."
All the cases we have cited were approved by this Court in Paul v.Washington, 134 N.C. 363, the opinion in which the principle was considered and the cases relied on were reviewed, having been concurred in by four of the members of the Court, as then constituted — the ChiefJustice, Justice Douglas, Justice Connor, and the writer of this Opinion — and becoming thereby the opinion of the Court upon that question, which really decided the case (as Justice Douglas well said) without regard to the question as to the validity of the ordinances. In the leading opinion the correctness of some of the decisions is questioned, but the learned justice who spoke for the Court frankly states that, while "the writer of this opinion is in sympathy with the argument of counsel of the appellant, the majority of the Court are of the opinion that the law as laid down in the cases above cited is correct in (522) principle and applies to the facts of this case and to all others in which the attempt may be made to test the validity of a municipal ordinance by injunction." So that the doctrine may be considered as settled in this State against the authority of a court exercising equitable jurisdiction to interfere by injunction with other courts in the due course of administering and enforcing the criminal laws of the State. Whether this rule is of universal application, or will in extreme circumstances admit of exception when justice would otherwise be defeated, we need not decide, as the principle thus established is clearly applicable to the facts of this case. If the court of a State will not thus interfere with another court of the same State and arrest by injunction the prosecution of a defendant for a crime, surely it will not recognize the power of a court in another and practically a foreign jurisdiction to do so.
We must adhere to our own rulings, which have become settled precedents upon this subject, and hold that the United States Circuit Court had no power to enjoin the prosecution of the defendant in the *Page 379 
court below, and the proceedings of that court introduced in evidence, and on which the defendant relies, can afford it no protection against the indictment or prevent a conviction thereunder.
This places our decision, so far, upon a general principle in the law of injunctions which governs in courts of equity. But the same doctrine, to the extent that it affects this case and as obtaining in the Federal courts, is fully stated by Justice Gray in Ex parte Sawyer,124 U.S. 200: "Under the Constitution and laws of the United States, the distinction between common law and equity, as existing in England at the time of the separation of the two countries, has been maintained, although both jurisdictions are vested in the same courts. The office and jurisdiction of a court of equity, unless enlarged by express statute, are limited to the protection of rights of property. It has no jurisdiction over the prosecution, the punishment or the pardon of crimes or misdemeanors, or over the appointment and removal of public officers. To assume such a jurisdiction, or to (523) sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses, or for the removal of public officers, is to invade the domain of the courts of common law or the executive and administrative department of the Government. Any jurisdiction over criminal matters that the English court of chancery ever had, became obsolete, long ago, except as incidental to its peculiar jurisdiction for the protection of infants, or under its authority to issue writs of habeascorpus for the discharge of persons unlawfully imprisoned. 2 Hale P. C., 147; George v. Pritchard, 2 Swanst., 402, 413; 1 Spence Eq. Jur., 689, 690; Attorney-General v. Ins. Co., 2 Johns. Ch., 371, 387. From long before the Declaration of Independence it has been settled in England that a bill to stay criminal proceedings is not within the jurisdiction of the court of chancery, whether those proceedings are by indictment or by summary process."
Lord Chief Justice Holt, in declining, upon a motion in the Queen's Bench for an attachment against an attorney for professional misconduct, to make it a part of the rule to show cause that he should not move for an injunction in chancery in the meantime, said: "Sure, chancery would not grant an injunction in a criminal matter under examination in this Court, and if they did, this Court would break it and protect any that would proceed in contempt of it." Holderstaffe v. Saunders, 6 Mod., 16. LordChancellor Hardwicke, while exercising the power of the court of chancery, incidental to the disposition of a case pending before it, of restraining a plaintiff who had by his bill submitted his rights to its determination from proceeding as to the same matter before another tribunal, either by indictment or by action, asserted in the strongest terms the want of any power or jurisdiction to entertain a *Page 380 
bill for an injunction to stay criminal proceedings, saying: "This Court has not originally and strictly any restraining power over (524) criminal prosecutions"; and again: "This Court has no jurisdiction to grant an injunction to stay proceedings on a mandamus, nor to an indictment, nor to an information, nor to a writ of prohibition, that I know of." Mayor of York v. Pilkinton, 2 Atk., 302 (s. c., 9 Mod., 273); Montague v. Dudman, 2 Yes., Sr., 396. The modern decisions in England by eminent equity judges concur in holding that a court of chancery has no power to restrain criminal proceedings, unless they are instituted by theparty to a suit already pending before it, and to try the same right thatis in issue there. Attorney-General v. Cleaver, 18 Yes., Jr., 211; Turnerv. Turner, 15 Jur., 218; Saull v. Brown, L. R., 10 Ch., 64; Kerr v.Preston, L. R., 6 Ch., 463. Mr. Justice Story, in his Commentaries on Equity Jurisprudence, affirms the same doctrine. Story Eq. Jur., sec. 893. And in the American courts, so far as we are informed, it has been strictly and uniformly upheld and has been applied alike, whether the prosecutions or arrests sought to be restrained arose under the statutes of the State or under municipal ordinances, citing many cases to sustain the principle.
There is, perhaps, a more conclusive reason why we should hold that the suit in equity pending in the United States Circuit Court and the restraining process issued therein by the circuit judge cannot be of any avail to this defendant, so as to prevent a prosecution against it in a State court for the commission of a crime. The Circuit Court of the United States has no jurisdiction to entertain a suit to enjoin a State, brought by a citizen of any other State or country, even though it may appear that the law upon which the prosecution in the State court is founded conflicts with the Constitution of the United States and is therefore void. This rule is evolved from the Eleventh Amendment to the Constitution, which provides as follows: "The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United (525) States by citizens of another State or by citizens or subjects of any foreign State." It is well known that this provision was inserted in the Constitution as a result of the decision in Chisholm v. Georgia, 2 Dallas, 419, decided in 1793, and it was construed in Osborne v. Bank, 9 Wheat., 738, in which case the Court said: "In all cases where jurisdiction depends upon the party, it is the party named in the record. Consequently, the Eleventh Amendment, which restrains the jurisdiction granted by the Constitution over suits against the States, is of necessity limited to those suits in which a State is a party on the record." But that narrow interpretation of the amendment has long since been rejected by the same Court, and by many successive *Page 381 
decisions it has firmly established the principle to be that if the State is substantially or really a party to the record against whom the suit is directed, she comes within the protection of the amendment. In Exparte Ayers, 123 U.S. 443, a leading case upon this question, it appeared that Ayers, as Attorney-General of the State of Virginia, and the Commonwealth's attorneys of the several judicial circuits were authorized by a legislative act to bring suit against delinquent taxpayers who had tendered coupons which had been taken from the bonds of the State in payment of taxes, the burden of proving the genuineness of the coupons being placed by the act upon the defendants. A suit in equity was brought in the United States Circuit Court to restrain and enjoin the said Ayers from bringing actions under the act or attempting to enforce its provisions, and an injunction was issued from that court according to the prayer of the bill. Ayers refused to obey the writ, and was accordingly attached for contempt, whereupon he applied for and obtained a writ of habeas corpus from the Supreme Court of the United States, and at the hearing was discharged from custody. With reference to these facts, the Court, by Justice Matthews, said: "The question really is whether the Circuit Court had jurisdiction to entertain the suit in which that order was made, because (526) the sole purpose and prayer of the bill was by final decree perpetually to enjoin the defendants from taking any steps in execution of the act of 12 May, 1887. The principal contention on the part of the petitioners is that the suit nominally against them is, in fact and in law, a suit against the State of Virginia, whose officers they are, jurisdiction to entertain which is denied by the Eleventh Amendment to the Constitution, which declares that the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State or by citizens or subjects of any foreign State.' It must be regarded as the settled doctrine of this Court, established by its recent decisions, `that the question whether a suit is within the prohibition of the Eleventh Amendment is not always determined by reference to the nominal parties on the record.' Poindexter v. Greenhow,114 U.S. 270. This, it is true, is not in harmony with what was said by Chief Justice Marshall in Osborn v. Bank, 22 U.S. (9 Wheat.), 738. Accordingly, in Cunningham v. R. R., 139 U.S. 446, it was decided that in those cases where it is clearly seen upon the record that a State is an indispensable party to enable the court, according to the rules which govern its procedure, to grant the relief sought, it will refuse to take jurisdiction. . . . The relief so sought is against the defendants, not in their individual but in their representative capacity as officers of the State of Virginia. The acts sought to be restrained are *Page 382 
the bringing of suits by the State of Virginia in its name and for its own use. If the State had been made a defendant to this bill by name, charged according to the allegations it now contains — supposing that such a suit could be maintained — it would have been subjected to the jurisdiction of the court by a process served upon its Governor and Attorney-General, according to the precedents in such cases. If a (527) decree could have been rendered enjoining the State from bringing suit again its taxpayers, it would have operated upon the State only through the officers who by law are required to represent it in bringing such suits, namely, the present defendant, its Attorney-General, and the Commonwealth's attorneys for the several counties. For a breach of such an injunction these officers would be amenable to the court as proceeding in contempt of its authority, and would be liable to punishment therefor by attachment and imprisonment. The nature of the case, as supposed, is identical with that of the case as actually presented in the bill, with the single exception that the State is not named as a defendant. How else can the State be forbidden by judicial process to bring actions in its name except by constraining the conduct of its officers, attorneys, and agents? And if all such officers, attorneys, and agents are personally subject to the process of the court, so as to forbid their acting in its behalf, how can it be said that the State itself is not subjected to the jurisdiction of the court as an actual and real defendant? It is, however, insisted upon in argument that it is within the jurisdiction of the Circuit Court of the United States to restrain by injunction officers of the State from executing the provisions of State statutes void by reason of repugnancy to the Constitution of the United States; that there are many precedents in which that jurisdiction has been exercised under the jurisdiction of this Court, and that the present case is covered by their authority."
The Court, after reviewing the authorities at length, denied the contention of the complainants and held with the petitioner that the suit was one against the State, and the proceedings against him for the alleged contempt in disobeying the order of injunction therein issued was consequently null and void. Referring again to the suit in equity for an injunction as being one essentially against the State of Virginia in its sovereign capacity, though nominally against its prosecuting (528) officers, the Court said: "It is therefore within the prohibition of the Eleventh Amendment to the Constitution. By the terms of that provision it is a case to which the judicial power of the United States does not extend. The Circuit Court was without jurisdiction to entertain it. All the proceedings in the exercise of the jurisdiction which it assumed are null and void. The orders forbidding the petitioners to bring the suits, for bringing which they were adjudged in *Page 383 
contempt of its authority, it had no power to make. The orders adjudging them in contempt were equally void, and their imprisonment is without authority of law."
The next case in order, which presented the precise question we have here, is Reagan v. Loan and Trust Co., 154 U.S. 362. It was attempted in that suit, as here, to enjoin the Corporation Commission and other officers of the State of Texas from enforcing a statute authorizing them to prescribe the maximum rate of charges by railroads as carriers. The Court laid down certain specific propositions as having been settled by its former adjudications. The great question involved is stated to be the right of the State to regulate or limit traffic charges, and it was held that the Legislature had the power to fix rates and the extent of judicial interference as protection against unreasonable rates. The question of the validity of a rate or charge for transportation in respect to passengers or freight, involving as it does the element of reasonableness, both as regards the company and as affecting the public, is eminently one for judicial investigation, requiring the process of law for its determination. R. R. v. Minnesota, 134 U.S. 418. The power thus to regulate the affairs of corporations, and, in the case of carriers, to limit their charges for transportation, is not without limit. It is not a power to destroy, and regulation is not the equivalent of confiscation. Under the pretense of prescribing a maximum charge for fares and freights, the State cannot require the carrier to transport persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use (529) without just compensation or without due process of law. Stonev. Loan and Trust Co., 116 U.S. 307; Dow v. Beidelman,125 U.S. 680. It was also decided by the Court that the undoubted general power of a State to regulate the fares and tolls which may be charged and received by railroad or other carriers can be exercised through the medium of a commission or administrative board created by the State for that purpose and in order to execute the will of the State as expressed by its legislation. Stone v. Loan and Trust Co., 116 U.S. 307. In that case it was held to be the settled doctrine of the Court that a State has power to limit the amount of charges by railroad companies for the transportation of persons and property Within its own jurisdiction, unless restrained by some contract in the charter, or unless what is done amounts to a regulation of foreign or interstate commerce. General statutes regulating the use of railroads in a State, or fixing maximum rates of charges for transportation, when not forbidden by charter contracts, do not necessarily deprive the corporation owning or operating a railroad within the State of its property without due process of law, within the meaning of the Fourteenth Amendment to the Constitution *Page 384 
of the United States, nor take away from the corporation the equal protection of the laws. While the principles thus stated were recognized and affirmed in Reagan v. Loan and Trust Company, supra, the Court distinctly adopts as a rule equally well established what is said inEx parte Ayers, supra. Justice Brewer, delivering the opinion of the Court, refers to that decision and classifies the cases in which interference by injunction is and is not permitted. He says: "We are met at the threshold with the objection that this is a suit against the State of Texas, brought by a citizen of another State, and, therefore, under the Eleventh Amendment to the Constitution, beyond the jurisdiction of the Federal court. The question as to when an action against officers (530) of the State is to be treated as an action against the State has been of late several times carefully considered by this Court, especially in the case of Ex parte Ayers, 123 U.S. 433. To secure the manifest purpose of the constitutional exemption guaranteed by the Eleventh Amendment requires that it should be interpreted, not literally and too narrowly, but fairly and with such breadth and largeness as effectually to accomplish the substance of its purpose. In this spirit it must be held to cover not only suits brought against a State by name, but those also against its officers, agents and representatives, where the State, though not named as such, is, nevertheless, the only real party against which alone in fact the relief is asked, and against which the judgment or decree effectually operates. It is well settled that no action can be maintained in any Federal court by the citizens of one of the States against a State without its consent, even though the sole object of such suit be to bring the State within the operation of the constitutional provision which provides, `No State shall pass any law impairing the obligation of contracts.' This immunity of a State from suit is absolute and unqualified, and the constitutional provision securing it is not so construed as to place the State within the reach of the process of the court. Accordingly, it is equally well settled that a suit against officers of a State to compel them to do the acts which constitute a performance by it of its contracts is, in effect, a suit against the State itself. In the application of this latter principle two classes of cases have appeared in the decisions of this Court, and it is in determining to which class a particular case belongs that different views have been presented. The first class is when the suit is brought against the officer of the State as representing the State's action and liability, making it, though not a party to the record, the real party against which the judgment will so operate as to compel it to specifically perform its contracts. The other class is where a suit is brought against defendants who, claiming to act as officers of the State and under (531) the color of an unconstitutional statute, commit acts of wrong *Page 385 
and injury to the rights and property of the plaintiff acquired under a contract with the State. In the Reagan case the suit had proceeded to final hearing and decree, and a perpetual injunction was granted upon the findings of fact, which showed that the rates were confiscatory, and, besides, the Legislature did not itself prescribe the maximum of charge for transportation, but left that matter to be determined by the Commission. The provisions of the act were not enforcible except by the Commission. In this particular that case and this one are clearly distinguishable.
Before proceeding to discuss further the rulings in the Supreme Court of the United States upon this important and far-reaching question, which now engages perhaps more of the attention and anxious consideration of the public and of the courts of this country than any other, as it should, for it vitally concerns the due and lawful exercise of the powers conferred by the Constitution upon the Federal Government and those reserved, respectively, to the States or to the people, and should be settled definitely and conclusively in order to avoid unfortunate judicial conflicts, we will pause to decide one question involved in this case which also differentiates it from Reagan v. Loan and Trust Co. There is nothing in our act which makes its operation depend at all upon anything to be done by the Corporation Commission, or the Attorney-General or his assistant. The said officers last named are required to prosecute in the name of the State any crime committed in violation of the act, but Ex parte Ayers is direct authority that they cannot be reached by an injunction while in the performance of this official duty. Besides, can it be said, with any show of reason or even with the sanction of plausible argument, that a suit for an injunction directed against the Attorney-General in the prosecution of criminal cases in which the State, under our law, and the sovereign under all (532) law, is the plaintiff of record and, too, the real plaintiff, is not, in its very nature and in its natural and necessary effect, a suit against the State? Can it be said, in answer to this suggestion, that the State can proceed against criminals and yet at the same time that she can be deprived of all power to do so by her duly constituted law officers, charged with the duty of enforcing the criminal law? The injunction had just as well be issued against the grand juries or the judges who preside in her courts. The act provides (Public Laws 1907, ch. 216, sec. 7) that it shall be in force from and after 1 July, 1907, and the provision that the Corporation Commission is required to publish the rates "fixed by this act" on or before 1 June, 1907, for the information of the public and the railroads concerned, is directory and not intended to stay the operation of the act beyond 1 July, 1907, should the Commission fail in the performance of that duty, nor in law, by any reasonable construction of the act, does it have any such effect. The maximum rate *Page 386 
prescribed by the act was unconditionally effective from and after 1 July, 1907, and the act was therefore self-executing. For this reason alone, if for no other, the suit in equity pending in the United States Circuit Court cannot be permitted to affect the proceedings in the court below in this case.
R. R. v. Minnesota, 134 U.S. 418, so much relied on by the defendant's counsel, is also far from being an authority against the ruling we now make. The act, construed and held valid in that case, provided that the tariff of rates as made and published by the Railroad Commission should be final and conclusive as to what are equal and reasonable charges, and that there should be no judicial inquiry into the matter for the purpose of determining the reasonableness of the rates so prescribed. Quite a different case from this one. We do not say that a judicial inquiry cannot be made in a proper way, but that the State, in the exercise of its sovereign power, cannot be enjoined under the (533) guise of restraining her officers in the performance of a duty which is not required to make the rate act effective. Nor can the State be controlled by the Federal courts in the execution of her criminal laws. But it may be remarked, in passing, that the opinion of the Court inR. R. v. Minnesota, as well as the concurring opinion of Justice Miller, especially cited by the defendant's counsel as controlling this case, was met by an exceedingly strong dissent from Justices Bradley, Gray, andLamar, who asserted that what is a reasonable charge is not a judicial question, but is "preeminently" a legislative one, involving considerations of public policy as well as of remuneration, and that the Legislature may itself fix the maximum and thus exclude judicial inquiry, or it may merely provide that the rate shall be reasonable, or that reasonable rates shall be determined by a commission or by the common law, when the question of reasonableness is open to judicial investigation. They further asserted that the Court, in R. R. v. Minnesota, had virtually overruled Munn v.Illinois, 94 U.S. 113, and the cases afterwards decided and based upon the principle of that case. When we consider the real nature of a corporation, the source of its creation, and the tenure, if we may so speak, by which it exercises its privileges and franchises, and, indeed, holds its property, the reserved power of the State with respect to it and many other facts and reasons that can easily be adduced, it may well be a question whether the advantage and strength of the argument in that case was not all with the dissenting justices. But, accepting the principle announced by the majority of the Court as the law with us, and we so accept it, it does not bear upon this case and should not control our decision. We also think the many other eases on which the defendant's counsel rely are equally inapplicable to the facts of this case. There is no evidence in this ease, *Page 387 
and of course no adjudication binding upon us, that the rate prescribed by the act of 1907 is confiscatory, nor do we understand the defendant to rely upon the record of the proceedings in the (534) Federal court as establishing that fact (for it would not be evidence for that purpose), but merely as showing that complete and exclusive jurisdiction of the entire matter was in that court by virtue of the suit therein pending, and that its order of injunction extends so far in its broad sweep as to stop the State in the ordinary enforcement of its criminal laws. This would be a very alarming doctrine if true, but fortunately it is not.
Recurring to that part of our opinion where we digressed in order to consider the nature of the act of 1907 and to determine when it became effective, and to distinguish from the case at bar certain cases decided by the Supreme Court of the United States which it is contended by the defendant are decisively in its favor, we will refer to one other case recently decided by the Court.
In Fitts v. McGhee, 172 U.S. 416, it was attempted to enjoin the Attorney-General of Alabama and the solicitor of one of her judicial circuits from prosecuting suits for penalties provided for violations of an act fixing the maximum tolls to be charged by a bridge company for the use of its bridge across the Tennessee River. The Supreme Court denied the jurisdiction of the Circuit Court of the United States, and the case, as we understand, establishes three propositions, as follows:
"1. A suit to restrain officers of a State from taking any steps by means of judicial proceedings in execution of a State statute to which they do not hold any special relation is really a suit against the State within the prohibition of the Eleventh Amendment to the Federal Constitution.
"2. The Circuit Court of the United States sitting in equity is without jurisdiction to enjoin the institution or prosecution of criminal proceedings commenced in a State court.,
"3. The power of the Federal courts to interfere by habeas corpus
with the trial of indictments found in State courts, on the ground that the State statutes under which the indictments are found arc repugnant to the Federal Constitution, laws or treaties, will not (535) be exercised, in the first instance, unless there are exceptional or extraordinary circumstances to require it, but the party will be left to make his defense in the State court." In the course of the opinionJustice Harlan says: "Let them appear to the indictment and defend themselves upon the ground that the State statute is repugnant to the Constitution of the United States. The State court is competent to determine the question thus raised, and is under a duty to enforce the mandates of the supreme law of the land. Robb v. Connolly, *Page 388 111 U.S. 624. And if the question is determined adversely to the defendants in the highest court of the State in which the decision could be had, the judgment may be reexamined by this Court upon writ of error. That the defendants may be frequently indicted constitutes no reason why a Federal court of equity should assume to interfere with the ordinary course of criminal procedure in a State court." The Court then proceeds to distinguish the cases cited in the defendant's brief filed in this Court, upon the ground that the State officer in each of them was committing or about to commit some specific act of trespass, to the injury of the complainant's rights. Other equally satisfactory reasons could be assigned why the suit in equity now pending in the Circuit Court of the United States should not be allowed to defeat the prosecution of the indictment in the court below, but we do not deem it necessary to consider or even state them, as what we have already said upon this point is sufficient to convince us that the Federal court was and is without jurisdiction to stay the institution of criminal proceedings in a State court, and we would affirm the judgment in this case if it did not appear that no criminal offense is charged in the bill of indictment We will now consider that question.
The State contends that the first section of the act of 1907 contains a distinct prohibition against common carriers of passengers charging (536) more than 2 1/4 cents per mile, and that, while a penalty is imposed for a violation of that section, it is done by a subsequent section of the act, and where this occurs, although the offense may be a new one, or one not existing at common law, the State can proceed by indictment to punish a violation of the first section, and the party specially aggrieved thereby may also at the same time recover the penalty, it being conceded, as we understand, that if the penalty had been imposed in the first section, where the prohibition is found, this would not be so, and an indictment would not lie. If there is any respectable authority for such a position — and we do not think there is — it is not Only inherently unsound, but exceedingly refined and technical, and Mr. Bishop says that it is not only refined, but is contrary to all reason. It is a distinction without a difference, in law or in fact. The act prohibits a charge above 2 1/4 cents, and then provides in a subsequent section (4) that any railroad company violating its provisions shall be liable to a penalty of $500 for each violation, recoverable by the person aggrieved, in a civil action, and any agent of the company violating the act shall be guilty of a misdemeanor. How could the Legislature more clearly or convincingly have expressed its intention to discriminate, as to the consequences between a violation by the railroad company and a similar violation by its agent, and what practical difference can it make whether the penal provision is in the first or the fourth section of *Page 389 
the act? Does not the latter section distinctly refer to the former, the same as if it had been incorporated with it?
The rule of construction relied on by the State seems to have arisen from a total misconception of the English authorities and a rank dictum of Justice Ashurst in Rex v. Harris, 4 T. R., 205, with no authority cited to support it. Lord Kenyon, who wrote the leading opinion in the same case, expressly states that the offense created by the act of Parliament (26 Geo. II., ch. 6, sec. 1), namely, disobedience of an order of the King in council, was in itself an offense at common law, (537) and Lord Ashurst, afterwards, in his opinion, explains, if lie does not destroy, his dictum by confining it to the special facts of that case.
The law is thus stated by Bishop in his work on Statutory Crimes (1873), sec. 250: "The doctrine is, that where an offense is created by statute, and the same statute prescribes the penalty or the mode of procedure, or anything else of the sort, only that which the statute prescribes can be followed. But where the offense is at common law, statutory provisions not directly repugnant to the common law are cumulative, and either law may be followed. And where a statute forbids a thing before lawful, but provides no penalty, the indictment for the offense is at common law. So, where it prescribes no mode of prosecution, the common-law indictment lies." He cites numerous cases in the note to that section, among them several English cases which sustain his statement of the rule, and under it the case of Rex v. Harris, supra, was correctly decided, because the penalty imposed by the statute construed in that case was for an offense which previously existed at the common law. The authorities cited by the learned counsel for the State can be easily reconciled with the principle as stated by Mr. Bishop, if they are read with reference to the particular facts being considered in them. Reg. v. Buchanan, 8 Ad. and El. (55 E. C. L.), 883, was a case of like kind with Rex v. Harris, as the offense of an attorney practicing without having been duly admitted or called to the bar or enrolled was made a contempt of court which, we know, and it is so held in the opinion of Lord Denman, was also a misdemeanor at common law. It is intimated by the Chief Justice that if a penalty had been imposed instead of the remedy by attachment for contempt given, the result in that case would have been different. Section 237, cited from 1 Bishop on Cr. Law, is, in our opinion, inferentially against the State's contention. We reproduce it here: "It is obvious that to prohibit a thing by a statute is to bring it within the jurisdiction of the tribunals. Whence we see, carrying in our minds what is stated in the last section, how and why, as explained in another volume, when a statute forbids a thing affecting the public, but is silent as to (538) *Page 390 any penalty, the doing of it is indictable at the common law." (Italics ours.) In Rex v. Wright, 1 Burr., 543, it was held that "indictment lies not upon an act of Parliament which creates a new offense and prescribes a particular remedy." Lord Mansfield said in that case: "I always took it that where new created offenses are only prohibited by the generalprohibitory clause of an act of Parliament, an indictment will lie; but where there is a prohibitory particular clause, specifying onlyparticular remedies, there such particular remedy must be pursued, for otherwise the defendant would be liable to a double prosecution — one upon the general prohibition and the other upon the particular specific remedy." And when afterwards informed that the counsel for the Crown "gave up the matter," he replied, "I do not wonder at all at it; I thought he would do so. I have looked into it, and there is nothing in it. That case of Crofton (where the contrary is supposed to have been decided) has been denied many times." In Rex v. Robinson, 2 Burr., 799-803, the great Chief Justice (Lord Mansfield) said: "But where the offense was antecedently punishable by a common-law proceeding and a statute prescribes a particular remedy by a summary proceeding, there either method may be pursued, and the prosecutor is at liberty to proceed either at common law or in the method prescribed by the statute, because there the sanction is cumulative and does notexclude the common-law punishment. 1 Salk., 45. Stephens v. Watson
was a resolution upon these principles. In that case keeping an ale-house without license was held to be not indictable, because it was no offense at common law, and the statute which makes it an offense has made it punishable in another manner." And again in the same case, when discussing the same point, he sums up, at page 805, as follows: (539) "The true rule of distinction seems to be that where the offense intended to be guarded against by statute was punishablebefore the making of such a statute prescribing a particular method of punishing it, there such particular remedy is cumulative and does not take away the former remedy; but where the statute only enacts `that the doing any act not punishable before shall for the future be punishable in such and such a particular manner,' there it is necessary that such particular method by such act prescribed must be specificallypursued, and not the common-law method of an indictment." In Castle'scase, 2 Cro. Jac., 644, it was resolved that where a statute imposes a penalty for doing a thing which was no offense before, and provides how it shall be recovered, it shall be punished by that means and not by indictment. The offense being new, the particular mode of punishment must be pursued. The generally accepted rule upon this subject is thus stated in 1 McClain's Cr. Law, sec. 8: "If the act prohibited has been previously an indictable offense, it will be presumed that the *Page 391 
civil penalty therefor is cumulative; but when the act creates a new offense and makes that unlawful which was lawful before, and prescribes a particular penalty and mode of procedure, that penalty alone can be enforced." See, also, 16 Enc. Pl. and Pr., 239; Reg. v. Wigg, 2 Salk., 460; Com. v. Bridge Co., 68 Mass. 67; S. v. Maze, 25 Tenn. 17; Peoplev. Hislop, 77 N.Y. 331; Com. v. Evan, 13 Serg. and R., 426; McElhiney v.Com., 22 Pa. St., 365; Hellings v. Com., 5 Rawls, 63; Journey v. State,1 Mo., 428; Com. v. Howes, 32 Mass. 231; S. v. Sinnot, 15 Neb. 472;U.S. v. Laeskl, 29 Fed., 699; Pentlarge v. Kirby, 19 Fed., 501; Carlev. People, 12 Ill. 285; Reed v. R. R., 33 Cal. 212; S. v. Crocroft, 2 ibid., 233; Battleboro v. Wait, 44 Vt. 459; Moses v. Sprague,11 R. I., 541; Confrey v. Stark, 73 Ill. 187. But S. v. Snuggs,85 N.C. 542, is exactly in point, for the act of issuing a marriage license to persons under 18 years of age was forbidden in one section and the penalty was imposed in another section, Ruffin, (540)J., for the Court, said: "The statute not only creates the offense, but fixes the penalty that attaches to it, and prescribes the method of enforcing it; and the rule of law is, that wherever a statute does this, no other remedy exists than the one expressly given and no other method of enforcement can be pursued than the one prescribed. The mention of a particular mode of proceeding excludes that by indictment, and no other penalty than the one denounced can be inflicted. 1 Russell on Crimes, 49;S. v. Loftin, 19 N.C. 31." It has held, therefore, that no criminal offense was charged in the indictment, and it was quashed. In this connection Ruffin, J., at page 544, further said: "We are convinced that his Honor's ruling in quashing the indictment is correct, in view of the fact that the statute creates the offense, affixes the penalty, and prescribes the mode of proceeding — the mention of the particular method operating to the exclusion of every other." (Italics ours.) In Loftin's case, supra, which is relied on by the Court in Snuggs' case, and which states the same rule, Judge Gaston, who wrote the opinion, cites with approval Castle's case, Cro. Jac., 64; 1 Salk., 45, and Rex v.Robinson, 2 Burr., 803, which we have already mentioned as English cases sustaining the rule. S. v. Snuggs was expressly approved in S. v.Bloodworth, 94 N.C. 918, and by the strongest implication in S. v.Parker, 91 N.C. 650, and S. v. Addington, 121 N.C. 538. There is no sound reason for, and, not intending to use too harsh a term, no practical sense in the distinction between a statute which prohibits an act to be done, and then in the section denounces the penalty, and one in which the penalty is imposed in a separate section; and especially can no such rule be applicable to the statute we are now construing, as the legislative intent is unmistakably expressed — that for disobedience to the provision of section 1 the carrier *Page 392 
(541) shall pay a penalty only to the party aggrieved, and the agent shall be liable to indictment for a misdemeanor; and counsel for the State, on the argument, answered a question from the Court in such a way as clearly recognized this to be the intention. Being asked why the Legislature had discriminated against the agent, the reply was (and undoubtedly the correct one), it was supposed that the penalty could not be recovered from the agent, while it could be from the carrier.
But it is suggested that the defendant, while not liable as a principal for doing the act itself, is liable criminally as accessory before the fact, having counseled, aided and abetted the agent in the sale of the ticket, and, as all accessories in misdemeanors are regarded as principals, the defendant thereby became a principal under the law. This is a very strange and, to our minds, a very illogical argument and a palpable nonsequitur.. The judge who presided at the trial evidently did not take this view of the case, for he charged the jury upon no such theory. He plainly thought that the sale of the ticket by the agent made the defendant, his employer, liable per se. In other words, that the act of the agent was the act of the principal under the first section of the act and the doctrine ofS. v. Kittelle, 110 N.C. 560. But he failed, inadvertently, to take into account the fact that in the case cited (if it can be considered as stating a correct rule) there was no special provision in the statute under which Kittelle was indicted for penalizing the employer, as there is in the act of 1907, which brings this case directly within the decision in S. v.Snuggs and takes it out of the principle decided in S. v. Kittelle. In the latter case Kittelle was held liable for the act of his employee because he held the license to sell liquor, and, further, upon the principle applying to the law of contracts and civil torts, that the principal must answer for the acts of his agent (respondeat superior), and that he who does an act through the medium of another party is in law considered as doing it himself. (Qui facit per alium, facit per se.) The difference between that (542) case and this one is manifest. Besides, the defendant here is a corporation and can act only by its agents. It has no personality or individuality. The principal can do no more by this agent than if he were personally present and acting. The very thing the agent does, whether he be the agent of a corporation or of an individual, marks the extent of the principal's liability. It cannot go beyond the limits of the agent's act. So, in this case, when the agent sold the ticket, even under the order of his principal, the defendant, he did the very thing and the only thing prohibited by the act of 1907, ch. 216, for which he and his principal are made liable by the act — he to an indictment for a misdemeanor and the principal to a penalty. How could the defendant, a mere legal entity, commit the act prohibited by the statute *Page 393 
except by its agent? The statute itself, by its very terms, recognizes this fact — that the corporation can act only by its agent, and, therefore, that the act of its agent is what renders it liable for the penalty. If a corporation can act only through its agent, and thereby becomes, in law, completely identified with its agent, how can it be an accessory to his act? For in such case it must be accessory to its own act, which is a legal absurdity.
It appears from the act of 1907 that a penalty is denounced against the carrier and the agent is made criminally liable for the same offense, namely, disobedience of the prohibition in section 1, against charging more than 2 1/4 cents per mile. The Legislature, by an elementary rule of statutory construction, is presumed to have had the law as settled by S. v.Snuggs, in mind when it passed the act of 1907, and that act will be construed according to the rule as therein stated. The Legislature is presumed to know the existing law and to legislate with reference to it. The case of Kittelle and cases of its class do not apply, as no special punishment was provided for the principal in the law upon which they were decided, while in the act of 1907 there is a special remedy against the principal. The doctrine of accessories does not apply, as we have shown, and the corporation (543) would, even under that doctrine, commit the identical act for which the penalty is provided; and, besides, no one can be an accessory to his own act, as already explained. The legislative intent is so clear and unmistakable that it would seem to be impossible to misunderstand what is so plainly expressed.
Much is said in the briefs about the equity of the suit in the Federal court and the complainant's right to an injunction. We would not agree with the learned judge who issued the interlocutory injunction if that matter were strictly before us and we were required to pass upon it, for we do not think there was a sufficient disclosure of the facts which are necessarily within the knowledge of the complainant in that suit (the defendant in this indictment) to entitle it to the favorable consideration of a chancellor. It is a very serious matter to suspend the operation of a public statute and to postpone the execution of the people's will at the instance of a private suitor, even upon the allegation that his property is about to be confiscated or some other constitutional right is about to be impaired, and it should not be done except upon a full disclosure of all the facts in the complainant's possession and upon the clearest showing that the threatened injury will at least probably result. "It is a cardinal principle of equity jurisprudence that a preliminary injunction shall not issue in a doubtful case. Unless the court be convinced with reasonable certainty that the complainant must succeed at the final hearing the writ should be denied." Hall Signal Co. *Page 394 v. R. R. Signal Co., 153 Fed. (C.C.A.); City Signal Co. v. R. R., 75 Fed., 1004. It has been held by at least one Federal court, when considering the identical question presented in this case, that it would be impossible to decide whether the reduction of a rate will be confiscatory in the absence of an actual test of the same. The Court held that whether it would be so or not was speculative and mere guess-work, (544) and that the testimony of an ordinary business man, expressing his opinion, or even of railway experts also giving opinions and illustrating them by the use of many figures based upon past experience, was not satisfactory and did not relieve the doubt and uncertainty sufficiently to warrant the issuing of a preliminary injunction. R. R. v.Hadley, 155 Fed., at p. 225.
In this case the reports of the defendant to the Corporation Commission do not tend to diminish the uncertainty as to what effect the lower rate will have upon the defendant's income, but rather to increase it. It would be natural to suppose that a lower rate would cause increased travel, and, while additional facilities must be provided for it, the relative increase of the cost of the latter and of the remuneration from the natural increase in passenger traffic cannot be determined with any degree of certainty except by actual trial. We have carefully examined the opinion of the Federal court in this matter, and have not been convinced thereby that we have erroneously decided any of the questions growing out of the equity suit. We refer especially to Ex parte Wood, 155 Fed., 190, in which the petitioner, a ticket agent of the defendant, who applied for the writ of habeas corpus, was granted the writ and then discharged for a violation of the act of 1907. The decision is based upon the ground that the sale of tickets was "an act done in pursuance of an order, process, or decree of a court of the United States or judge thereof," under Rev. Stat. of U.S., sec. 753 (U.S. Comp. Stat., p. 592). This is giving a very broad and liberal construction to that section. Can it mean that the criminal laws of a State shall be suspended by the order of a single Federal judge, even if they conflict with it? We cannot give our assent to such a construction, and we are quite sure that our Chief Justice
did not intend to sanction it in the quotation made by the learned circuit judge in Ex parte Wood from S. v. Boone, 132 N.C. 1108. He was speaking there of a duty enjoined (545) by a valid Federal law not being punishable by the State as a crime, and not merely of one imposed by the order of a Federal judge.
But it is unnecessary to continue this comment any further, as the defendants in the equity suit must avail themselves of any erroneous ruling therein by exception and an appeal from the decree entered in that suit at the final hearing. We do not think, upon the question of the jurisdiction of the Federal court, that Mfg. Co. v. Los Angeles, 189 U.S. 207, *Page 395 
and Dobbins v. Los Angeles, 195 U.S. 241, which are cited inEx parte Wood, bear any analogy to the equity suit wherein the order of injunction was issued, under which Wood is alleged to have been acting when he sold the tickets. In the former case (189 U.S. 207) Justice Brown
clearly distinguishes the two classes of cases from each other. The State in this proceeding is enforcing her criminal laws.
It must not be understood by what we have said that we are criticising the decision of the Federal court, but merely examining the grounds and reasons upon which it rests, with a view of determining whether it should have any influence upon our conclusion in this case. We always discuss respectfully the decisions of other courts, however much we may disagree with them, and it is our pleasure as well as our duty to do so, for any other course would be most unseemly.
The question here is not whether one who advises or commands a criminal act to be committed is himself liable, nor whether that admitted principle applies to corporations, for it clearly does; nor is it whether a railroad company is liable civilly for any damages caused by the unlawful act of its agent which he has been required by the company to do, or which it has afterwards ratified.
All these principles are elementary, but they have no application to the facts in this case, no more than the right of a creditor to enforce the payment of a debt legally due to him by his debtor could have. The question, and the only one, is whether the Legislature has created a new offense and prescribed a specific punishment or penalty (546) for its commission, and if so, whether this does not exclude the common-law remedy by indictment. We cannot pervert the meaning of plain words and change the intent of the Legislature, because able lawyers may have been members of that body. If that be so, more is the reason why we should construe the statute according to its clearly expressed meaning. What the Executive shall do if any emergency has arisen requiring him to act is not a question in this case, and we have, and should have, no suggestion to make as to his duty in the premises. We are assured that, in the independent exercise of his high official functions he will act wisely and well and for the best interests of the people.
Since this opinion was prepared we have found that the Supreme Court of the United States, in Yates v. Bank, 206 U. 5., 158, has decided the very question presented in this case precisely as we have in regard to the right to indict. It says: "The civil liability of National bank directors, then, in respect to the making and publishing of the official reports of the condition of the bank, a duty solely enjoined by the statute, being governed by the `National Bank Act,' it is self-evident that the rule expressed by the statute is exclusive because of the elementary *Page 396 
principle that, where a statute creates a duty and prescribes a penalty for nonperformance, the rule prescribed in the statute is the exclusive test of liability," citing Bank v. Dearing, 91 U.S. 35. So, in a note toLeathers v. Tobacco Co., 144 N.C. 330, which is reported and annotated in 9 L.R.A., at page 349, it is said, at page 392: "If a statute imposes a new duty and creates a new right, and at the same time provides a specific remedy to punish the neglect of the one and to secure the other, that remedy is exclusive, and no other action lies for an infraction of the statute. But if a statute, recognizing an old right, imposes another duty in respect to it, and provides a method of enforcing it, the remedy provided in the statute is cumulative, and existing rights (547) of action are unaffected unless expressly taken away. These authorities treat the principle as elementary and undeniable.
Upon a review of the whole case our opinion is that the Federal court had no jurisdiction to enjoin the finding and prosecution of this indictment, and that the suit in that court is virtually one against the State, within the meaning and intent of the Eleventh Amendment to the Constitution of the United States. But it is clear that, as no criminal offense is alleged in the indictment, there is nothing for us to do but to arrest the judgment.
Judgment arrested.
Cited: Harvey v. R. R., 153 N.C. 577; Lumber Co. v. Trading Co.,163 N.C. 317; Express Co. v. High Point, 167 N.C. 106; R. R. v. MoreheadCity, ib., 121; S. v. R. R., 168 N.C. 105; S. v. Berry, 169 N.C. 373;Corporation Commission v. R. R., 170 N.C. 570; Davis v. R. R., ib., 600.
(560)